The District Court committed two legal errors in weighing prejudice from the conceded due process violation of deportation. First, it applied subsequent events retroactively to elevate a misdemeanor into an aggravated felony. Second, it relied on factor that all IJs are precluded by law from considering findings from a bond hearing. Because Mr. Alcon's equities were comparable on balance with those in multiple cases on voluntary departure, he had a plausible case for relief in 2009. So the removal order and all the subsequent reinstatements are invalid under RA Sedonius. Now, the government argues that for the first error, it didn't occur, but it has to implausibly massage the record in order to get to that point. And the second error, they admit, did occur, but claim that it's not error, but that's contrary to this Court's case law and the straightforward regulation governing that. Now, the District Court relied principally on two points, that the 2010 probation revocation elevated his misdemeanor to an aggravated felony. And let me just read what the District Court said on it, because it's clearing, its ruling is very clear. It says, the Court finds that the probation revocation and resulting sentence escalated your earlier misdemeanor conviction to an aggravated felony, and the aggravated felony precluded relief from deportation and removal, and you cannot show that you had a plausible ground for relief. Now, it's about as clear as it can be that that is the Court's ruling and finding. So it's one of the two bases. The problem, of course, is that under Vidal-Mendoza and the Scott case from the Second Circuit that I discussed in the briefs, you can't retroactively take events that happen after the deportation hearing and use them to affect the result and say what was plausible or likely to happen during the actual deportation hearing. And that makes sense, because what it is, what the 1326d motion attacks is the due process at the time of the removal. Now, the government would be the first one to cry foul if Mr. Alcon said, you know, a year later, I had a U.S. citizen child, and that gives me an equity that would have allowed me to get relief. The government said, well, you can't do that. You can't look at such a thing. Let's say that that portion of the district court's analysis was in error because it sort of bootstraps what happened subsequent to the hearing, but didn't the district court have an alternative basis for its ruling relying solely on the record that was before the IJ? I think the district court was quite explicit with regard to that as well in saying that even before your 2009 conviction, you had a number of convictions, a number of domestic violence convictions, and he listed a couple of examples. And based on this record, the court finds that you would not have had any plausible grounds for relief. Because this particular defendant had a quite extensive history and not a lot of positive equities in his favor. So it seems to me that the district court went right to the plausibility analysis to say, look, I think that immigration judge didn't advise you appropriately, but looking at this record, you wouldn't have been able to make a plausible case. Well, the court did mention the prior convictions, no doubt about that. But then it says right after that, and more tellingly here for our purpose today, is that the immigration judge found prior to your deportation hearing that you were a danger to the community. Now, what we have here is like, at best, we have a decision by a district judge that's based on three pillars. Two of them are illegal. The third, mentioned only in passing very briefly without any discussion, but absolutely relegated to a secondary position in the judge's explicit statement, is plausible grounds that the court could have relied on. But when a court makes a discretionary decision and relies principally on two illegal factors, that decision is erroneous and has to be remanded back, even if on a secondary level, it relies on something that is proper. Because on whole, the decision is unreasonable. It's based on errors of law. And an error of law, by definition, is an abuse of discretion. What were his positive equities that would have weighed favorably against a very extensive criminal history that included several domestic violence convictions? And I believe one of his positive equities had to do with a girlfriend who was the victim of at least one of those domestic violence convictions. Your Honor, last night I was going back. I was going back and looking at Mr. Alcone's record and thinking about this very heartily and looking at the actual record that was available at the time of the deportation. There were three of the four convictions that he had. All of the convictions that he had were misdemeanors with an average of 47 days jail time. So those were not extremely egregious cases. But in these cases, three of the four, or the majority of them, four of them, were within six months of the deportation hearing. And, in fact, the three domestic violence convictions were all in the course of three months. And this was a woman he had been living with for three years, had been supporting and supporting her child, and took her child as his own. They had a long-term relationship which, admittedly, seems to be rocky, but it seems like a very short period of time where the relationship took a very nasty turn. I also found out by looking at the record, something that unfortunately is not in the briefs but is in the PSR, that at the last domestic violence conviction, one month later, the judge on the first conviction, just three months earlier, revoked probation, but then reinstated probation with the condition that he attend a 52-week domestic violence program. But one month into that, before he'd even done a portion of that program, he was taken into immigration custody and removed a month later. So I would say that, yes, he has these convictions, but we have to look at them in what really was going on here. Something that's like a very short term, that they were together for three years, and that there was something that happened, who knows what was going on. And these were misdemeanors with 30-day jail terms. The last one was 90 days. But as for the positive equities, let me say that he, everything, the government wrote a 28-J citing Rojas Pedrosa. Rojas Pedrosa says there are three major categories of positive equities. Well, Mr. Alcone has every one of those. They talk about long residence. He spent nearly half his life in this country living in one place in Riverside. He went to high school here, or went to night school, achieved a certificate in English because he wanted to better himself. He had close family ties. He had this common law LPR relationship that he was in for three years, continuing even at the time of the PSR in this case, on this conviction. He still believed that the plans were that this woman was going to come live with him in Veracruz, Mexico. The relationship was continuing. He came back to the country to earn money to support her and the child. He also had a sibling living in the United States at the time of the federal deportation. And the third category Rojas talks about is humanitarian needs, which is exactly what impressed the district judge here, that he was working steadily to support this woman, although they, of course, had a very bad patch there at the end. But also beyond that, he had a very good work history. He worked for four years as a landscaper and rose to the position of a foreman, and he says he was making fairly good money at that. So the criminal record were all misdemeanors, DUI and domestic violence, and license violations. They were all less than 90 days, more than 90 days or less, with a 47-day average. And as I said, most of them came within the six months before the deportation. And the first two were three years apart. His first offense and then three years before another one, and then something happened. Then it accelerated. We don't know what that is. But given that kind of record, let's say that that, in comparison to other cases that have granted voluntary departure or found that voluntary departure was appropriate, that that is not anywhere near the same kind of record. It was minor misdemeanors, a number of them, but altogether with minor jail sentences. And then he had these sufficient equities, I think, to outweigh those. Now, there are some cases that have much stronger equities, but they also have much more egregious criminal histories to overcome. And I think on the balance we have to look at is that Mr. Malcon had a more modest set of positive equities, but he also had a more moderate criminal history to overcome, as opposed to these other cases. I would like to emphasize two things about voluntary departure as a type of relief that's important to keep in mind. Voluntary departure does not grant anyone anyone's status. It's unlike any other type of relief. It doesn't give you status. It doesn't give you a right to stay in the country. All it does is it leaves the door open that you may be able to come back to the country sometime way down in the future. All it is is an act of grace. And so it really isn't giving you anything except that you can leave and you still have a chance sometime in the future. Also, it's well recognized in the case law that voluntary departure has positive institutional benefits and therefore is a favored version of relief. It's comparable in immigration court to plea bargains in a criminal court. We want to promote these things because they clear the docket and they relieve the government of much of the burden and of the court. And so it should be the same, and that should be reflected in the prejudice analysis because it's something that immigration judges should be looking forward to doing and so it should be easier to accomplish. All right. Thank you, counsel. I would like to reserve the rest of my time. This is not a question. All right. Thank you. George Madigan for the United States.  The United States argued that the district court's oral decision was either, as Judge Wynn said, gave two alternative reasons for why he didn't find that the defendant had plausible grounds for getting voluntary departure, at least one of which had nothing to do with any future events. Actually, the United States also argued that that future thing was actually in response to a totally separate argument of the United States. But I would like to focus, since this is the NOVA review and since the court can affirm the ruling on any basis supported by the record, I'd like to jump to what I think the heart of the matter is, which is did the court err? So do you agree that the two other, that relying on a future act and relying on a finding in a bond hearing were both error? The United States has always agreed that the court should not look at future acts. Okay. The United States argues that the court didn't do that. I know. At least in the alternative. Do you agree that would be error if we read it that way? That there were three grounds? Yes. Yes, we do. If the court exclusively ruled that it wasn't plausible based on future acts, that would be error. But even in that circumstance, this is the NOVA review in which this court can affirm on any basis supported by the record. I understand that. So it's time to look at, you know, what would be at best. So let's focus on the third one, which is the criminal background versus the positive background. Right. So, and I'd like to focus on three Ninth Circuit cases. One is the recent published case of Rojas-Pedroza, and two are unpublished cases, Vassallo-Martinez and Sanchez-Lara. Focusing first on Rojas-Pedroza, again, published case, it's controlling law. The others are at best, I can't think of a term. Persuasive. Persuasive. So Pedroza says you have to look at the positive and negatives. It tells us which are the positive and which are the negatives. You have to look at it. Now, Pedroza, I'm sorry, Rojas lines up very well with Vassallo because it's hard to compare exact cases because there are positive and negatives in every case, and sometimes one positive is higher than one's negative. It's hard to compare that. But Vassallo and Rojas, the negatives are pretty similar. They're basically DUI convictions. In Rojas, there's two DUI convictions, and there's a couple of legal entries, and there's some drug, I'm sorry, some other driving convictions. And in Vassallo, there's four DUI convictions and what they call three unrelated misdemeanors. But for these kind of cases, they're pretty similar. Basically, the really bad thing is DUIs. Now, what's different in these two cases is the positive equities. In Rojas, the guy had been living in the United States on and off for 16 years. In Vassallo, much greater positive equities. In the United States for 21 years, he had a United States citizen wife and child. All of his family lived in the United States. He had been attending the same church for 20 years. He had been an auto technician for 17 years. He actually owned his own automotive business. Now, Vassallo is a 2-1 decision, so I think it's fair to say that it's close. And I know, Judge Wardlaw, you were in the majority in that decision. But it was a 2-1 decision, so I think it's fair to say, okay, with that much positive versus just DUI negatives, it's close, but it's plausible you could have gotten bonded to the question. In Rojas, the published decision, if all you got is you've been living here 16 years and you got these DUI convictions, it's not plausible. And again, that's a published case. Okay, so which case? Now, in this case, we similarly have two DUI convictions. Of course, we have a lot more than just that, but let's just focus on the DUI convictions for now. Are the defendant's case in this case, his or her positive equities, closer to Vassallo, or are they closer to Rojas? And here's what I see his positive equities as being. He lived in the United States for between 9 and 10 years. Now, of course, in the last two years, he was frequently in trouble. He doesn't really have close family ties. He has a cohabitant who has either a citizen or legal status, and I'm sorry, I don't know which. But again, as the judge pointed out, that's not the same as being married to a U.S. citizen. As a matter of fact, as the district court really relied on, that positive equity is really taken away when you realize, and I think Judge Winn, you said at least one of the domestic violence. No, no, it was all of them, all three of them. She's the victim. I'm just curious, do we have case law on whether it makes a difference whether the partners are married or not? In this context, I didn't see any. But the United States did cite some authority for the fact that, look, marriage is different. Marriage is a special relationship, and I think that comports with common sense to some degree. I mean, not to make light of it, but many men make the argument, hey, it's kind of the same living together, being married, but you get shot down. Right, but in this state, if you live together for seven years, aren't you? There is no common law marriage in California. There isn't, but there is in some states, right? There is, but marriage, as the Supreme Court recently told us, is a state issue. Okay, I know. I'm just curious about making that distinction in the immigration context. I do not have a case on point other than cases that say, look, marriage is different and the common sense argument. I would also note that in the PSR, the defendant didn't give any contact information for his cohabitants or anyone, so probation couldn't corroborate anything he's saying about how strong a relationship this is. So, again, I would argue that comparing, you know, just looking at Rojas and Visalo, this defendant's positive equities are much closer to Rojas. A published case which says two DUIs against not so strong positive equities, it's not plausible to get bond departure. Now, of course, in this case, there's a lot more going on on the negative side of the equation than just two DUIs, and I think there's 13 convictions at the time of the IJ hearing, and defense counsel emphasizes they're all misdemeanors, but not all misdemeanors are created equal. Three domestic violence are very serious. As a matter of fact, in Rojas-Petroza, again, a published decision, I'm sorry, no, they just said DUI is a serious negative factor. I apologize. But we all know domestic violence is important. First of all, it's, you know, they're often pled down. So the fact that they're misdemeanors because the victims don't cooperate. Again, there's nothing in the record to show that here. But just in general, domestic violence often have to be pled down. I want to explore this plausibility standard. How have we decided, how have we construed or defined plausibility? Is it like more than a 50% chance? I think the best we could say is it's less than likely, it's more than hypothetically possible. And that's about, even though there's a lot of cases on it, it's somewhere in between those two. It's almost in the eye of the holder. I mean, we don't really have a clear rule of how you determine plausibility. We have that issue in several cases. Right. So I've been thinking about how we would, if we were to describe what plausibility means. The best I could say in Rojas Pedroza, the published case, says that plausibility means in light of the fact it's relevant to the form of relief being sought based on the unique circumstances of the alien's own case, it was plausible, not merely conceivable, that the IJ would have exercised his discretion in the alien's favor. Okay, so discuss the plausibility in the context of the form of relief being sought here, which was voluntary departure. Exactly. And Rojas Pedroza talks about that. So in voluntary departure, you have to look at favorable and unfavorable factors. The favorable factors include long residence. Now, he's here 9 to 10 years. No, wait a second. He's 30 years old. He came at age 15, so half his life was here. That's true. But, again, in Vassallo, we're talking about 21 years. I mean, wouldn't you look at it in the context of a person's life? Well, in Rojas, again, the published case where they said it wasn't plausible, the defendant was on and off 16 years. I don't know how old he was, so I don't know. Yeah, he was on and off, though. This person was continuous half of his life in the United States. I mean, as a mathematical, that's correct. 9 to 10 years at about the age of 25. A little less than half, actually. Well, it depends if you use the starting age or the ending age, I suppose. I'll grant you it's about half his life. Okay. So close family ties, I don't think that he has much in terms of that here. And humanitarian needs, I didn't see much argument there. Was the child his or not his? The child was not his. We have a declaration where he says, well, I took the child on his own. Again, in the PSR, he doesn't even really mention the child when he talks to the probation officer. So we have a declaration where he says, well, she had a child and I was help raising him, for what that's worth. But, again, that's very different than having a U.S. citizen child of your own, which is what you saw in Vassallo Martinez. Now, he came from a family of nine siblings, all but one were at the time residing in Mexico, is that correct? What we can say is he had nine, according to the PSR, he told the probation officer he had nine siblings, they were all living in Mexico, and, of course, that's in the future. In his declaration, he said, at the time, at the IJ hearing, I had one sister in the United States. But I think very tellingly, in that same declaration, he says, her husband was a U.S. citizen, their child was a U.S. citizen, but doesn't mention the citizenship or legal status of his sister. So I think he, the court – Well, I said all of one because we've got to look at the record at the time. Right. But he's potentially eligible for that relief. His sister was here legally. So I don't think that's any positive equity. And, again, on the negative side of the equation, I mean, look, the problem, the reason why domestic violence is so bad is because we know it's underreported. And when there's a police report in this case that says – now, again, this is nine months after the IJ hearing where the victim says, I've called the police ten times. The police officer says, I've been to this house multiple times over the last two years. So it's not just the three convictions. It's all the other times he's abusing this woman. And, by the way, she's – I mean, again, this is in the future, but she's the same victim he then assaults with a weapon after he comes back, which leads to him becoming an aggravated felon. I think my time is up. I would love to discuss briefly the – It's in your briefs, I'm sure. Okay, that's fine. Thank you, Your Honor. All right, thank you. I have a couple minutes. I went over two minutes. Just two very brief points, Your Honors. First about the definition of plausibility that Judge Wardlaw asked about. This is something I've given a lot of thought to. And, of course, what we know from the case law is it's not actually would-get relief, and it's not conceivable. Conceivable, what's the inconceivable relief? To me, that means it's impossible. But when is a discretionary relief impossible? When you're not statutorily eligible for it. That's when it's inconceivable. So somewhere between not eligible and certain or virtually certain to get it is where plausible lies. But where, you don't know. I pointed to the case Gonzales-Valerio that said it's a prima facie case. Now, that's something concrete. Prima facie has a definite definition in the law, which means it's sufficient to support an exercise of discretion. Or from an appellate standard, it was a reasonable decision. It's a sustainable decision. So the question is that we have to look at is are these facts show that an I.J. could reasonably grant discretion on these facts? And if it is not an abuse of discretion, then it is plausible. It doesn't mean he will get it or should get it or must get it. It's just that it's reasonable because it's a prima facie showing. And that's what we have here, especially when we reduce it for the fact that the type of relief that's being sought is something that should not have a high hurdle. I want to also... And the BIA would not deem that to be an abuse of discretion. I think that's a reasonable way of saying is would this judge be... Would this I.J. be reversed for an abuse of discretion? How do we know? We look at case law. We see where has the BIA reversed or where has this court upheld or refused the grant of discretion. It seems like a fairly concrete way of doing it that's more specific than eyeballing it. Now, as far as Rojas Pedrosa, Rojas Pedrosa points three categories of positive equities. Mr. Alcón has every one of those. On page 18 of the slip opinion, it cites three negative equities. Mr. Alcón has none of those. He does not have a serious immigration violation prior. He came here when he was 14, probably brought in by a relative or something. He came here as a young child. The previous findings of inadmissibility, he was never in immigration proceedings before, so there is no previous findings. And the third one was the intent to violate the law. I'm not quite sure what that means, but I think in the context, because this comes from the inspector's field manual, they're talking about intent to violate the immigration law. Again, I don't think there's anything that shows that at the time of the removal that Mr. Alcón had a striking intent to violate the immigration laws. So he has all of the positive equities Rojas talks about and none of the negative ones. He does have a criminal history, but as I pointed out, we have to weigh that. We have to weigh it by the modesty of that record and the modesty of the equities compared to other cases and in the scope of the type of relief that was sought and whether or not that was reasonable that an IJ could have granted that discretion without being reversed. All right. Thank you very much, counsel. U.S. v. Alcón Mateo will be submitted.
judges: Wardlaw, Bybee, Nguyen